Good morning, and may it please the Court. My name is Omar Jafri, and together with Mr. Abraham, we represent the plaintiffs in this case. Your Honor, I would like to reserve two minutes for rebuttal. All right. I am going to address the misleading statements the defendants made with respect to the sales force and the sales pipeline, and then Mr. Abraham will discuss the merger-related statements. I'm sorry, say that one more time. Your Honor, I was going to address the statements about the sales force and the sales pipeline, and then Mr. Abraham will discuss the merger-related events from February of 2020. In this case, the defendants initially announced poor financial results in the beginning of 2019 and told investors that the company would meet its financial objectives because deals had simply slipped but would materialize later in the year. However, when they didn't materialize, the excuses shifted and they blamed unspecified macroeconomic conditions outside the United States without further explanation for the repeated shortfalls. Throughout 2019, the defendants made two key statements about two key issues. First, they claimed that they had a high number of experienced sales representatives and that those experienced sales representatives generated far more revenue than the inexperienced ones. Second, they also made representations about the nature of the pipeline and claimed that it was so large that even if the slipped deals did not materialize towards the end of the year, they would still be successful. Mr. Jaffe, may I ask you a question? We often, in security cases, talk in jargon, and the jargon I'm interested in is the term slipped. I think your position is that these weren't slipped deals that were represented as just a little bit tardy in performance, but deals that weren't made at all. They were salespeople saying we've got sales when the sales were still aspirational rather than actual. Is that correct? Yes, Your Honor, that is correct. And I think that just makes the actual facts on the ground worse. Because the issue here isn't specifically whether each one of these statements is literally false, it's whether they created a misleading impression of the business. And here they are saying that we have such a large pipeline, and all these employees that we have are generating so much revenue that there are no risks. And in fact, I think one of the key issues is we have to look at this in the context of the analysts who were the surrogates for the market. What kind of questions did they have? And repeatedly, if you look at the events in May of 2019, the back and forth colloquy is specifically, look, you've already told us that these deals have slipped. Why do you think that they will still materialize? Are there any risks that they will not materialize? And it is with respect to those specific questions that they went and made these misleading statements. What they did not disclose is that before the class period, they hired a third party neutral consultant who told them that your method of doing business places 50 percent of this pipeline at risk of failure. They decided to disregard that advice. And even though they themselves intended to implement this new methodology in the beginning of 2019, they threw it away in the trash can and continued to do business as they were normally doing it. According to the global talent and enablement manager who was responsible for implementing this very methodology, he could see that the failure to implement it would cause the company to miss its targets for the next three or four quarters. This allegation is indistinguishable from the one that the court upheld, an in-rate quality sys, where a similar confidential witness had said that he could see that the market was saturated and there would be a slowdown. These allegations went unaddressed in the order that dismissed the complaint below. Second, your honor, the order stated that we did not adequately plead that any of these deals, the illusory ones, your honor, that you referred to, were not in fact falsely reported as committed. Respectfully, that is simply incorrect. There are multiple named account managers who said that they were personally responsible for many of these deals, and these deals, in fact, actually did not materialize because customers had refused to purchase the products. Now you take this in conjunction with Mr. De Siza's repeated misrepresentations in the And then he explained what he meant by that, and he said, it's just not plausible that they would choose us and then change their mind. Well, according to the named account managers, that simply wasn't true. Yes, your honor. Sotomayor, is it your position that the standard, the district court, held your client's allegations to was correct? No, your honor. I don't believe that it was, because, for instance, if you look at the Sciento analysis, I don't believe that when the district court, for instance, said that these allegations from the tracking tool, and I think this is a good way to dovetail into this element, that the tracking tool that was used was insufficient or that the details were not sufficient pursuant to what you've pled. I don't think that's correct, and I don't believe that the reports that were provided by the deal desk manager were also insufficient. And my understanding of the order is that the district court found that those allegations were not sufficient, but similar allegations have been sustained repeatedly by the court in Oracle, in QualitySys, and in LifeLock. So with respect to the first point about the Clary, what it does is it's a software tool that provides up-to-the-minute updates. It tells you which deals are at risk, and it tells you when you are short on the pipeline. Three confidential witnesses state that Mr. DeCesar used it. He has publicly stated that it provides unparalleled visibility into the sales execution process. These facts were not addressed below, but if that's what this tool does, then it should have provided information about the deals that we have alleged were at risk. Second, he was provided with specific reports from the deal desk manager who prepared these reports for the senior vice president of operations. Those reports contained information about all deals over 500,000, and they had two specific things. The status of negotiations with the customer, and second, what were the steps that were left to complete the deals. According to numerous named account managers, the step that was left was that the customer had said, we don't want to purchase your products. These were reports that were provided to him on a weekly basis, and common sense would dictate that the information that the CW's claim was missing, which made these deals illusory, would have been included in it. Finally, Your Honor, about the question, I don't believe that the standard with respect to the insider trading is accurate, and it's certainly not correct in light of what a majority of circuits have held. Simply coming and saying we made these sales pursuant to a 10B51 plan. The standard is a reasonable probability of falsity, right? Correct. A reasonable belief. And you're confident you've met that? I do believe that these allegations are sufficient. We are only required to plead facts. We are not required to plead any evidence, and this was something that the court also has said in Zucco Partners. Thank you, Your Honor. All right.  Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Jeffrey Abraham. As Mr. Jaffrey previously noted, I will be addressing the statements following the announcement of the merger on February 6th. I'd like to reserve two minutes of time for rebuttal with the Court's approval. The statements fall into two broad categories. The first of these categories relates to Forescout's operations and consists of two statements concerning the company's operations and one risk disclosure. The statements relating to existing business conditions are that the company was leveraging our ecosystem of channel partners, which is an existing fact, and was being focused on educating existing partners with a very quote that refers to existing facts. The statement of risk was that entering into the merger agreement could, and I put the emphasis on the word could, adversely affect our business. These statements were first made on February 28, 2020, in Forescout's Form 10-K and were incorporated by reference and therefore made again in the proxy statement dated March 24, 2020. Now, in truth and in fact, two significant partners, sell-through partners, had terminated their relationship because they didn't want to work with a private equity person or private equity owner, and a third one was downgrading its relationship. Ultimately, in Forescout's own words in litigation subsequently filed in Delaware Chancery Court seeking to enforce the merger agreement, they attribute the tens of millions of dollars of lost revenue to the announcement of the merger, and that's, I believe, in paragraph 93 of the Delaware complaint filed by Forescout, which is referenced, if not quoted, in paragraph 130 of our complaint. The effect of these channel partner degradations, the two cancellations and one downgrading, was confirmed in July, 2020, when Forescout issued new financial forecasts, dramatically reducing forecasted revenues for fiscal year 2020, 2021, and 2022. Now, the defendants offer basically their core argument that these are forward-looking statements, but it's hard to understand how discussing an existing channel partner, our current ecosystem of channel partners can be forward-looking, and the concept of a risk factor refers to currently existing facts, and for that reason, when one states something as a risk, and the event has actually happened, it's materially false and misleading. And the other key argument they make is that plaintiffs have failed to demonstrate that defendants knew of the falsity of these statements. Now, let me leave aside the standards for a minute, but February 28th is three weeks after the merger agreement. There is no, it was announced, there is no other known trigger for the cancellations or degradations. There's nothing referred to in a subsequently filed tender offer statement, and given that, and consistent with this court's recent decision in the line technology case, which was the subject of a letter we sent to the court, it's at least reasonable, if not a 50-50 chance consistent with Tellab's, that those cancellations, in fact, happened very soon after February 6th, certainly by February 28th, and most certainly by March 24th. And in that vein, to allege falsity, we are not required to plead with Sienta. Falsity under 15 U.S.C. 78 U-4B1 is not a Sienta-based pleading consistent with this court's decision in matrix initiatives, which we cite in our brief, and consistent with the actual language of the statute. And in any event, strong inference has been pleaded based upon the Delaware claims. March 24th, it gets even stronger, because on March 20th, in the Delaware proceedings, ADVENT received alarming reports of changed circumstances. That's an ADVENT Delaware counterclaim, paragraphs 27 to 29, referenced in paragraph 141. These changes in circumstances are connected to Forescout's sales pipeline predictor as well as Forescout's counterclaim answer, paragraph 26, which is at 6 ER 1276. Forescout acknowledged it engaged in scenario planning in connection with the Q1 results. Forescout's Delaware counterclaim at paragraph 27. Forescout also attributed the shortfall to the loss of channel partners, as I discussed before. There were also statements made on April 23rd, 29th, and May 8th regarding the likelihood of the merger proceeding. There were known facts at that time. ADVENT telling Forescout they were reviewing matters, difficulty with funding the merger, that caused those statements to be entirely false and misleading. Are we up to May 11th yet? That's within that scope, Your Honor, yes. In fact, I don't think I need to say any more. In the Delaware pleading, they say, well, we're going to, they basically give notice, they're going to renege on it. And still, Forescout looks forward to closing the merger and a few days later files its complaint in Delaware Chancery Court. Your Honor, I see I'm cutting into my rebuttal time. Yes, but let me address May 11th, now that we're getting up there. Why isn't that covered by the safe harbor provision? Why isn't that covered? Because first of all, it doesn't relate to the operations of the company. Look at the safe harbor provisions, if you will. You know, the securities law, there was a reference here to jargon. And it's a statutory scheme under the PSLRA. It does not fit into any of the categories for safe harbor. The closest one could say is operations, but as we discussed in our brief, it's neither products nor services. It's a transaction. And even if it were a forward-looking statement, it's still, it's still a known existing fact that contradicts the underlying statement, Your Honor. At the time the May 11 statement was made, the, was there any indication or any pleading that the merger would not, in fact, go through, or was it still hypothetical at that point? Well, I'm going to say that if you look in our complaint, if you look in our complaint at paragraph 155, it references a header within the Delaware pleadings, and it says in bold there, which we quote, it says, Admin signals its intention to renege on the merger agreement. All right.  Thank you, Your Honors. Good morning, Your Honors. May it please the Court, Amy Longo on behalf of Apelli Forescout. I'm going to be addressing the arguments pertaining to falsity, and my co-counsel, Ms. Walters, is going to be addressing the arguments pertaining to scienter. Your Honor, we believe that this Court should affirm the District Court's ruling that the Second Amended Complaint still fails to plead particularized facts showing false or misleading statements at the time they were made. I want to start by pointing out what plaintiffs are no longer alleging here. They're no longer alleging that Forescout's projections in 2019 were false. They've backed away from that allegation, and what they allege instead are that positive generic statements that Forescout's executives made accompanying their projections and in the context of talking about earnings guidance were misleading at the time. Now, one thing that fundamentally undermines this theme is that Forescout met its projections for the first and second quarter of 2019. It revised its third quarter projections and then met the revised projections, and when it missed the fourth quarter guidance, it did so by only 2.4% and still reported growth for the year. Now, this kind of narrative is just not consistent with the plausible theory that, in fact, Forescout was hiding widespread trends in the sales function and that that function was collapsing. And I think to try to put a theory together, what plaintiffs try to do is point to the renegotiation of the merger in 2020 and say that that renegotiation somehow indicates that Forescout's 2019 performance was distorted. And looking at that allegation, first of all, one has to recognize that in early 2020, the world was dealing with the onset of a global pandemic. That changed circumstances everywhere. But moreover, what's alleged about the 2020 renegotiations of the merger agreement are that ADVENT declared a material adverse effect. And by definition, under the pleadings that are relied on in the Delaware case and cited in the complaint, that has to pertain to information that was occurring after the merger agreement was signed, and it relates to information for 2020 and beyond. It relates to the revised outlook and change circumstances, if you look at the Delaware pleadings that plaintiffs cite, not to anything pertaining to 2019. And what they do allege about 2019 and the basis on which they try to allege that defendants' statements throughout 2019 were false or misleading, it's important to look at what kind of statements those are. They don't challenge specific statements about the numbers of the pipeline. They don't challenge specific statements about how many employees were in the sales force or the productivity they allege. They challenge things like it was tracking well, or they were confident about growth. And what they base those allegations on... What about the slip deal allegations that's backed up by statements from confidential witnesses? Well, Your Honor, what I would say about that is that the confidential witness statements that we have here, although there are a lot of confidential witnesses, I think we really have a matter of quantity rather than quality. If you look at the nature of the overwhelming majority of the confidential witnesses and what we're told about them, they're salespeople. They're focused on closing deals. We're not told a lot about their responsibilities, but from their titles, we can infer that these are not people who are working on the sales forecasts at a company-wide level. There aren't allegations that these people were interacting with Mr. DeCesar or Mr. Harms or that what they were looking at... I don't know why it makes a difference in this particular case, given the allegations. The allegations are that Mr. DeSarze represented that every single one of the deal is in the pipeline. That's why we have an expectation that they would essentially materialize. He gave an example of one very large account. By the way, it's worth pointing out, in every one of those deals, we have the technology when already we've already been awarded the business. So those are pretty clear representations that the business has already been awarded. Then you couple that with confidential witness statements that there was a company-wide pressure campaign to misclassify deals, as if the deals were awarded when in fact they hadn't been awarded. That's pretty specific. Tell me why that doesn't paint a misleading picture. I think why it matters, Your Honor, is because you have to look at the context that the pipeline is much larger and disclosed to be a multiple factor of the actual deals that close in a particular quarter. There are no allegations that the deals that Mr. DeSarze referenced, when we said we already have the tech wins, that in fact Forescout didn't have them. You put together allegations of confidential witnesses alleging, let's say they believed a $1 or $2 million deal might not close or might be delayed. But what you don't have are allegations that Mr. DeSarze or Mr. Harms, who are looking at it as a company-wide matter, either agree with the line-level salespeople's characterization of certain deals in the pipeline, or that they were saying anything different internally than they were saying externally. I think if you look at some of the cases that plaintiffs refer to, for example quality systems, you have allegations that internally the CEO was saying the market is saturated, and that was a contrast to what they were saying publicly. We don't have any allegations of that nature here, and we don't have any allegations going to how what an individual salesperson looked at in terms of a deal or multiple deals rolled up to the company-wide process of forecasting the outlook for the quarter. And without that kind of specificity, these aren't the kind of confidential witness allegations that can be relied on to render Jarek's statements of optimism made by the company's top executives false or misleading. There's also a real lack of specificity in that the 2019 statements about the sales force and about the pipeline are between March and August largely, and many of the confidential witnesses who identify things such as difficulty closing deals, deals that slipped, they're not tied to specific statements that the plaintiffs are saying are false or misleading. Instead, plaintiffs are trying to look to what occurred in 2020 and read back onto it that there was some kind of collapse in the sales function at that time. And turning to the 2020 allegations, Your Honor, we submit that there's simply no basis to infer or reason that defendants were required to speculate about what ADVENT would do, whether it would close the merger or not on a timely basis in the absence of- Counsel, what about the statements after May 11? Your Honor, the statement, the latest statement that the merger was expected to close proceeds when ADVENT was notified for Scout that it would not close, and that was when for Scout announced it. There are allegations that the parties were working together to try to close the merger. There are no allegations in the complaint to suggest that either of the executives didn't legitimately believe that it still would close. And so- For Scout had to sue, didn't it? It did sue, Your Honor, but until and unless it was notified that ADVENT wouldn't close, we believe there's no case that supports the idea that for Scout should have been going out to the market to talk about speculative beliefs that perhaps ADVENT might not close. And the Water Island Tribune case from the Seventh Circuit this summer observes that point, that managers' thoughts about a pending transaction aren't expected to be an open book. And there's no allegations here that Mr. DeCesar or Mr. Harms were saying internally, I don't think they're going to close. Didn't for Scout- What does reconsidering the merger mean? Reconsidering the merger, does that mean that the merger's going to go through? Your Honor, I would submit that that kind of statement is still not one that would cause for Scout to need to make a different disclosure to the market. Well, it might cause them to not make any statement at all because ADVENT has said we're reconsidering the merger, but that's not what they said. They said that the merger was still going through. That was three days later. Is that not a false representation? I don't believe that creates a misleading impression because I believe, Your Honor, that it's likely that in negotiating a corporate transaction, there is a lot of back and forth that is separate and apart from the company's fundamental belief about whether a merger's going to go through. And there aren't any allegations that the company had determined that it wasn't going to go through before it was definitively advised of that. But ADVENT had determined that it was reconsidering, right? And three days later, your client says the merger's going to go through. Was there some fact that they learned between May 8th and May 11th that made the reconsidering no longer important? Well, I would submit, Your Honor, that the pertinent fact is when they learned definitively that ADVENT was reneging. And I think it's fair to assume, based on what's cited in the complaint and alleged in the Delaware pleadings, that Forescout believed the merger would close and was doing everything it could to bring that about. It did sue to bring about the merger closing. One thing is to say, they're reconsidering and we hope the merger will go through. The other thing is to say, we're not going to talk about them reconsidering, the merger's going to go through. There's a different quality between those two positions. Is there not for an average investor? I mean, I think one way to think about it is to try to imagine the kind of disclosure that could be expected of a party in a circumstance like that, which is to say, would they update the market to say, we're not sure if the merger's going to go through or we've received doubts from the other party? I think that is inconsistent with the cases that have considered it to say, you don't have a duty to speculate about what your partner is going to do unless and until you receive an indication that's definitive one way or the other. Okay, thank you. Judge Hawkins had a question. Yes. Didn't Forescout basically admit that the merger was in trouble in its pleadings against ADVENT? What I... Can you start with a yes or no? Sorry. Yes, Your Honor, I would agree that in its pleadings, Forescout characterized the discussions between the parties as being quite active at that time and that ADVENT was considering its options and having negotiations. I don't think that equates to the notion that Forescout had been advised it was going to back out until that event happened. And it's also in... So no obligation to disclose to shareholders anything other than ADVENT saying, we're done? I believe that's consistent with a couple of cases that have taken this issue on. And the reason is that an investor wouldn't have much to do with a sort of speculative disclosure that a merger may or may not happen. Here we also had risk disclosures Forescout provided, indicating that there... I think we understand your argument. You're well over your time. All right. Thank you very much, counsel, for your argument. Ms. Walters. Thank you. Sorry. Good morning, may it please the court. Diane Walters on behalf of individual defendants, Mr. DeCesar and Mr. Harms. The district court's dismissal of the Second Amendment complaint may also be affirmed on the alternative ground that the complaint fails to plead a strong inference of cyanide. To plead a strong inference of cyanide, plaintiffs must allege that each defendant made false or misleading statements either knowingly or with deliberate recklessness. The complaint lacks any such facts. Thus, it fails to satisfy the PSLRA's heightened pleading requirements, requirements that this court has referred to as formidable. I thought the complaint had some allegations that defendant themselves participated in this pressure campaign. I'm talking about the slippage issue that I was discussing with counsel. Can you address that or those allegations specifically and why they're not sufficient to meet the cyanide requirement? So the complaint does not allege that Mr. Harms participated in any pressure campaign. And the only allegation as to Mr. DeCesar is an allegation by CW13, an administrative assistant in a New Hampshire . . . I'm sorry. Can you speak up? I apologize, Your Honor. There's no allegation that Mr. Harms participated in a purported pressure campaign. And the only allegation that Mr. DeCesar participated in or allegedly participated in a pressure campaign is a single allegation by CW13 who was an administrative assistant in a recently acquired subsidiary in New Hampshire who doesn't claim to have even had any direct interaction or contact with Mr. DeCesar. So those are the only allegations as to the individual defendants with respect to that allegation. The CW allegations all suffer from the same critical defect. None of the CWs claims to have personal knowledge regarding the individual defendants' mental states at the time that any challenge statement was made. Indeed, none of the CWs even claims that the individual defendants made false or misleading statements, much less that they did so deliberately or knowingly. Who was the recipient inside Forescout of the May 11th conversation, announcement, whatever? I believe that . . . It is correct as of that date, someone from ADVENT told someone from Forescout that ADVENT was reconsidering whether to merge. That communication was made, yes, Your Honor. One of the things that I think is being . . . Who was it made to? I need to check that, but I believe the communication was with Mr. DeCesar. One of your clients? Yes. One of the things . . . I'm going to go ahead and jump to the merger allegations. One of the things that's being lost there is this was a binding merger agreement. The parties disputed whether there was . . . whether ADVENT even had a right to breach that merger agreement. Forescout obviously believed that it was a binding merger agreement, and they didn't have any right to do so. The fact that a counterparty might be having buyer's remorse in the middle of a global pandemic is not the same as knowing that they're going to try to breach a binding merger agreement. I think basically plaintiff's argument is suggesting that you have to try to read the So, going to the allegations regarding access to sales data, counsel referred to the Clery tool and Salesforce. If you look closely at the CW allegations, however, there's still critical facts missing. There's general allegations about how the data was available or how reports were prepared, but what's missing is what specific sales data was known at the time of any challenge statement. How did that data purport unidentified data purportedly render any challenge statement knowingly or deliberately false when made? Merely alleging the allegations about marketing language on a third-party website doesn't say what's known at the time of any challenge statement, nor does access to Salesforce information plead Sienner. If access to Salesforce information were sufficient to plead Sienner, the executives of every company that uses Salesforce, and it's used globally by a lot of companies, would be enough to plead securities fraud as the executives of those companies. I see I'm running out of time, so I'm going to jump quickly to the trading allegations. Plaintiffs asked the court to disregard that those were made pursuant to 10b51 plans as this court held in Metzler. The fact that they were made pursuant to 10b51 plans may rebut an inference of Sienner. That's not inconsistent with Pluralsight, which held that it may not per se rebut Sienner. It may rebut Sienner. It's a competing inference that the court may consider as part of a holistic analysis. And I see I'm out of time. Thank you. All right. Thank you very much for your argument. I know Mr. Abraham and Mr. Jaffray, you each wanted to reserve time. I think the clock ran down, but given that we took counsel over time as well, we'll put a minute on the clock for each of you for rebuttal. Mr. Jaffray? Thank you. Just a few points, Your Honor. First of all, with respect to their claim that their financial performance was terrific and we got it all wrong, I'm not going to go through the numbers. They're in the brief. We have a basis to plead that the company missed its targets by tens of millions of dollars and it was material. But lest there be no doubt about this, I wanted to point to you about what the surrogates of the market, which is what the analysts said. And you will find this at 1062. That's the page number for the record. It's paragraph 105 of the complaint. It's a specific question by Ms. Liani from Bank of America, who was an analyst. And she prefaces the question by beginning with, you missed the second quarter guidance, but you are raising. And then she has specific questions about what's the risk that this wouldn't materialize. You heard this, and this has been their position from the very beginning, where they go through the numbers and they say, every time we come in pre-announce and say something different, it's true. But in fact, even the analysts did not believe it. The second point, Your Honor. Counsel, you're over time, but I've got the ER and paragraph site. So I thank you very much for your argument. Thank you. Mr. Abraham. Your Honor, it's been observed silence is golden when it comes to the securities law. If you have nothing to say, you don't have to say anything. You can say no comment. I also want to observe in response to a prior question that one of the statements in April 23rd at the shareholder meeting was not identified as a forward-looking statement, was not accompanied by meaningful cautionary language, therefore unquestionably does not fall under the safe harbor provision of the PSLRA. But even for the other statements, I already made my argument that it doesn't fall within the language of the PSLRA safe harbor. But the warnings were not sufficiently specific. It applies equally with respect to the April 23rd statements. They received the communication on April 20th calling into question whether the merger could proceed. It's a material fact for any investor to know whether the counterparty to a merger wants to go forward. You could see it with Twitter and Elon Musk. Even if everybody thinks the agreement's binding, and especially because there's an issue of financing, it's hard to close a merger without adequate financing, and that's what the downturn in Forescout's operations really impacted here was Advent's ability to finance the merger. Thank you, Your Honor. Thank you, counsel, to all sides for your arguments in this case. Very helpful. The matter is submitted.
judges: HAWKINS, BEA, NGUYEN